J-A08003-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| SHAWN DAVID TAYLOR | : | |
| | : | |
| Appellant | : | No. 1532 EDA 2024 |

Appeal from the Judgment of Sentence Entered February 14, 2024
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0002497-2021

BEFORE: LAZARUS, P.J., McLAUGHLIN, J., and SULLIVAN, J.

MEMORANDUM BY LAZARUS, P.J.: **FILED OCTOBER 1, 2025**

Shawn David Taylor appeals from the judgment of sentence, entered in the Court of Common Pleas of Chester County, following his convictions of one count each of statutory sexual assault,[1] corruption of minors,[2] unlawful contact with minor–sexual offenses,[3] aggravated indecent assault of a child,[4] and involuntary deviate sexual intercourse (IDSI).[5]  After careful review, we affirm.

_____

[1] 18 Pa.C.S.A § 3122.1(b).

[2] *Id.* at § 6301(a)(1)(ii).

[3] *Id.* at § 6318(a)(1.2).

[4] *Id.* at § 3125(a)(8).

[5] *Id.* at § 3123(a)(7).

In September 2020, Taylor, who was 40 years old, met 15-year-old G.P. online on the website Omegle. G.P. told Taylor that she was nineteen years old. *See* N.T. Jury Trial, 7/12/23, at 75-76. After the initial meeting on Omegle, Taylor and G.P. began communicating through the social media application, Snapchat, using the chat function and with photos and video. *Id.* at 73, 87. G.P. told Taylor that she had very strict Indian immigrant parents and could only leave the house by sneaking out.

Shortly thereafter, Taylor, who lived in Virgina, drove to Chester, Pennsylvania, where G.P. lived, and engaged in sexual intercourse with G.P. in the back of his car. *Id.* at 83. In October 2020, Taylor again drove to Pennsylvania and engaged in sexual intercourse with G.P. *Id.* at 92, 94. Directly following this second encounter, G.P. was caught sneaking back into the house and was punished by her parents, which included restrictions on her phone use. *Id.* at 99, 101.

For several months, G.P. and Taylor exchanged occasional emails and eventually planned for G.P. to sneak out so they could meet up. In January 2021, G.P. and Taylor formulated a plan to buy a ladder to get G.P. off the roof of her house after she exited her bedroom window.

On January 16, 2021, Taylor drove to Pennsylvania and helped G.P. sneak out of her bedroom with a ladder. G.P.'s neighbor, Jason Murtaugh, and his then-girlfriend, Amia Reeves, saw G.P. and Taylor coming down her driveway with Taylor carrying a ladder. *Id.* at 34, 36. Taylor and G.P. drove away from her house and engaged in sexual intercourse in his car. After

Taylor and G.P. left, Reeves and Murtaugh decided to tell G.P.'s parents what they saw. *Id.* at 52. Taylor and G.P. returned to G.P.'s home, where Taylor was detained by Pennsylvania State Police (PSP). G.P. was taken to the Children's Hospital of Philadelphia (CHOP).

Following his arrest, Taylor was placed in a holding cell at the PSP Embreeville Barracks at approximately 2:30 a.m. *See* Suppression Hearing, 4/21/23, at 68. The barracks have two holding rooms, both of which consist of a metal bench and a cuffing rail. *Id.* Per the barracks' procedure, detainees remain cuffed while in the holding cell to prevent escape. *Id.* at 15.

At approximately 2:30 a.m., PSP Trooper Adam McCormack was assigned to the case. Trooper McCormack went to CHOP to interview G.P. and her mother and speak with a social worker, and other troopers. *See* Suppression Hearing, 4/21/23, at 67-68.

At around 10:45 a.m. on the same day, Trooper McCormack brought Taylor into a recorded interview room at the barracks. Trooper McCormack informed Taylor that the room was recorded and Trooper McCormack orally advised Taylor of his *Miranda*[6] rights and waiver of same. *See* Suppression Hearing, 4/21/23, at 16-18. Trooper McCormack also provided Taylor with a written form of his rights. *Id.* Taylor did not sign the form. *Id.* at 69. The interview lasted approximately 30 minutes, during which Taylor and Trooper McCormack discussed Taylor's relationship with G.P. *Id.* at 72. Trooper

---

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

McCormack ended the interview when Taylor asked, "can I get a lawyer at this point?" *See* Police Interview Transcript, 1/16/21, at 19-20. Taylor was subsequently released from custody.

On April 21, 2021, Taylor was charged via criminal complaint with the above-mentioned offenses. On March 15, 2023, following pre-trial motions and decisions not relevant to the instant appeal, Taylor filed an omnibus pre-trial motion. In particular, Taylor requested, *inter alia*,[7] that the trial court admit evidence at trial about prior physical discipline by G.P.'s father, G.P.'s "inappropriate relationship with a third party," and photographs of G.P, and asked the court to suppress his January 16, 2021, interview statements because the police violated his ***Miranda*** rights. *See* Omnibus Pre-Trial Motion, 3/15/23, at ¶¶ 31-44; 54-64; 75-85; 86-87.

On April 21, 2023, the trial court conducted a hearing on Taylor's suppression motion. *See* N.T. Suppression Hearing, 4/21/23, at 3. The trial

_____

[7] In his omnibus pre-trial motion, Taylor also sought to introduce evidence of G.P.'s prior sexual conduct and statements made to Taylor and to exclude evidence of any reference to: G.P. as a "victim"; the website "Omegle" as an adult website; G.P.'s prior, unrelated sexual assault; and a missing persons report of Taylor filed by his wife. Further, Taylor sought to permit a stenographer to create a transcript of G.P.'s forensic interview.

These motions were resolved by the parties' stipulation and by the trial court's order and are not part of this instant appeal. *See* Stipulation, 4/27/23, at ¶¶ 1-4 (parties stipulating to exclude references to "Omegle" as adult website, G.P.'s prior sexual assault, and missing persons report, and permitting stenographer to create transcript of G.P.'s forensic interview); *see* Order, 4/28/23, at ¶¶ 1, 8 (trial court granting and denying in part Taylor's motion to exclude reference to G.P. as "victim" as well as Taylor's motion to include G.P.'s prior sexual conduct and statements made to Taylor).

court concluded that Taylor made a knowing and voluntary waiver of his *Miranda* rights and denied his motion to suppress. *Id.* at 71-74. Following the resolution of the suppression motion, the trial court ordered a separate hearing to address Taylor's evidentiary claims. *See* Order, 4/21/23.

On April 27, 2023, the trial held a hearing regarding Taylor's motions seeking to admit the above-mentioned evidence at trial. At the hearing, Taylor, in anticipation of his mistake of age defense at trial, sought to introduce evidence of physical discipline by G.P.'s father and certain photographs of G.P. to establish that his belief of G.P. being 19 years old was reasonable. *See* N.T. Pre-Trial Motions Hearing, 4/27/23, at 6-8; 37-39. Taylor also sought to introduce impeachment evidence that G.P. had "inappropriate relationships" with two other adult men who she communicated with online. *Id.* at 13-22. On Taylor's motion to admit evidence of G.P.'s "inappropriate relationship with a third party," the parties ultimately agreed that G.P. did not have a "relationship" with the alleged third parties, but rather allegedly communicated with two adult third parties, and therefore, the parties were not to refer to the communications as "relationships" at trial. *See* Order, 4/28/23, at ¶ 7. At the conclusion of the hearing, the trial court ordered an in camera hearing on all three evidentiary motions on appeal. *Id.* at ¶¶ 5, 7, 9.

On June 5, 2023, the trial court held an in camera hearing on Taylor's three evidentiary motions. As they are relevant to the claims raised in this

appeal, we summarize the claims, arguments, and rulings made on Taylor's three evidentiary issues in turn.

Regarding Taylor's motion on physical discipline, the in camera hearing was to determine what discipline G.P. was subject to between September 2020 and January 16, 2021, the alleged period of contact between Taylor and G.P., and whether G.P. communicated this discipline to Taylor. Order, 4/28/23, at ¶ 7. Defense counsel pointed to various instances in the preliminary hearing transcript where G.P. testified that she told Taylor her parents were very strict and described their various restrictions on her. *See* N.T. In Camera Hearing, 6/5/23, at 7, 9-12, 15-16. Specifically, counsel relied on portions of G.P.'s preliminary hearing transcript where she testified that her parents punished her after catching her sneaking out, including restricting her phone and laptop use, her door being taken off of her bedroom, and having her mom sleep in her room. *Id.* at 8-9.

In reference to physical discipline by G.P.'s father, defense counsel sought to introduce, at the April 27, 2023 hearing, Taylor's statement from

his police interview that G.P.'s parents "hit her"[8] as well as a Childline Report[9] alleging that G.P. previously called the police on her father for physical discipline. *See* N.T. Pre-Trial Motions Hearing, 4/27/23, at 5, 7-8. Counsel also referenced G.P.'s forensic interview, in which G.P. discussed an incident with her father "coming after [her] with his—you know, he was ready to hit [her for] something" and "the next day he threatened to hit [her] again." *See* N.T. In Camera Hearing, 6/5/23, at 14-15. Further, counsel cited G.P.'s statement that: "[S]o it's like — let's say my dad screams at me and calls me stupid and tells me that I am worse than a retarded kid who is 5 years old,

_____

[8] Taylor stated in his police interview:

> [Trooper McCormack]: Hmm. Does she not like her parents or is she just. . .
>
> [Taylor]: She said she's, uh, she gets—she doesn't get along with her parents at all.
>
> [Trooper McCormack]: Okay.
>
> [Taylor]: And, uh, they yell and scream and hit her. So, um, the only way she can go out, literally, is to sneak out.

Police Interview Transcript, 1/16/23, at 8.

[9] At the April 27, 2023, hearing, defense counsel referenced a redacted, one-page Childline Report that counsel had faxed to the trial court. However, the Commonwealth objected to the report on the basis that it was not authenticated, and the trial court sustained the objection. *See* N.T. In Camera Hearing, 6/5/23, at 18-20 (trial court sustaining Commonwealth's objection to Childline report for failure to present G.P.'s testimony to authenticate statements).

which—he has said multiple times I—I—he just has no self[-]control." *Id.* at 17.

Regarding the proposed photographs, the in camera hearing was held to determine whether G.P. sent photographs of herself to Taylor, when the photographs were sent to Taylor, and whether the proposed photographs from the April 27, 2023 hearing Taylor sought to admit at trial were depictive of the Snapchat photos[10] she sent to Taylor. *See* Order, 4/28/23, at ¶ 9. Counsel argued that the proposed photos were not covered by the Rape Shield Law,[11] were "similar" to the Snapchat photos, and anticipated that G.P., as well as Taylor if he testified, would admit that the proposed photographs looked like the Snapchat photos. *Id.* at 39. Counsel relied upon the proposed photos, which were recovered from G.P.'s computer within a few days of Taylor's arrest, and offered a police report that referenced emails between G.P. and Taylor, which indicated G.P. sent photographs of her face and body to Taylor. *Id.* at 39-40. However, defense counsel did not set forth any evidence regarding whether the proposed photographs were similar to the Snapchat

---

[10] It is uncontested that G.P. sent photos to Taylor via Snapchat. It is similarly uncontested that the Snapchat photos no longer exist. *See* N.T. In Camera Hearing, 6/5/23, at 39. In any event, for ease of reference, we refer to these photographs as the "Snapchat photos."

[11] *See* 18 Pa.C.S.A. § 3104(a). The Rape Shield Law was enacted "to prevent irrelevant testimony relating to the victim's past involvement in sexual activities from being presented to the trier of fact in order to protect the victim from being prejudiced because of unwarranted perception as to her moral character rather than based on the facts of the case." *Commonwealth v. Riley*, 643 A.2d 1090, 1093 (Pa. 1994).

photos and, instead, asked for a bifurcated hearing in order to subpoena G.P. so she could testify about the proposed photos. *Id.* at 41. The Commonwealth stated that G.P. would not be available to testify prior to trial.[12] *Id.*

Regarding G.P.'s communications with other adult men, defense counsel stated that she did not want to introduce the communications for the purpose of what Taylor "knew[,] but instead to impeach the credibility" of G.P. and argued that the evidence was permitted to pierce the Rape Shield Law. N.T. In Camera Hearing, 6/5/23, at 25. Counsel introduced G.P.'s statement from the forensic interview that she was only communicating with her friends on Facebook. *Id.* at 25-27. Additionally, defense counsel introduced a Facebook notification from G.P.'s computer blocking the contents of two adult individuals. *Id.* at 28. Counsel also relied upon a police report that included the ages of the two men,[13] that G.P.'s parents told the police that G.P. had been communicating with these individuals, and that her mother had used G.P.'s Facebook account to advise them that they can't talk to G.P. *Id.* at 29-30.

_____

[12] G.P. was unavailable due to her high school graduation and would be out of the country shortly thereafter until a few days before trial. *Id.* at 41. Neither party had subpoenaed G.P. for this hearing.

[13] G.P. was allegedly communicating on Facebook with a man named Jason from Missouri, who "appear[ed] to be between 45 and 50 years old" and a man named Sean/Shawn from Michigan, who was "described to [defense counsel] as [being] 23 years of age." N.T. In Camera Hearing, 6/5/23, at 29-30 (citing Facebook notification and police report).

Following oral argument and a review of the record and the proffer evidence set forth by defense counsel, the trial court ordered the following:

> [Prior Discipline by G.P.'s Father:] The Commonwealth agreed that evidence of the discipline of [G.P.] that she communicated to [Taylor] is admissible, including evidence that her bedroom door was removed, her phone and laptop were taken away from her, and her mother was sleeping on her bedroom floor. [Taylor] failed to establish that [G.P.] told [Taylor] about possible physical discipline she may have received; therefore, this evidence is inadmissible at trial.
>
> [Communications with Third Parties:] [] The admissibility of this evidence shall be decided at the time of trial. [G.P.] may be questioned about inconsistent statements she may have made regarding communications with the two older males, her claim that she only talked to her friends on Facebook, and that [Taylor] was the only "older guy," but the Commonwealth may object if a proper foundation has not been laid. Counsel shall not reference any of this potential evidence in opening statements.
>
> [Introduction of Photographs of G.P.]: shall be decided at the time of trial after a proper foundation is laid. Any objections may be made at that time.

Order, 6/7/23, at ¶¶ 1-3 (underlining omitted).

A jury trial was conducted from July 11 to 14, 2023. At trial, G.P. testified, and, consistent with the trial court's evidentiary ruling, was questioned about the punishments she received from her parents. On direct examination, G.P. testified that, following Taylor's arrest on January 16, 2021, her dad was standing at the door when she got home and that "in [] stressful situations, he makes a lot of jokes, and he, like, laughs a lot." N.T. Jury Trial, 7/12/23, at 116. G.P. also testified that when she returned home after the second encounter with Taylor, her dad "scream[ed], like—like in a [']to get my attention['] type of way, not like an angry scream or something. I [ran]

- 10 -

to my room, and he's like, get over here." ***Id.*** at 97. During cross-examination, the following exchange about G.P.'s father took place:

> [Defense Counsel]: Okay, [a]ll right. On direct examination, you said that when your dad found out he laughed, is that what you said?
>
> [G.P.:] I said. . .
>
> [Defense Counsel]: You said your dad, he doesn't really get that angry, he laughs?
>
> [G.P.:] I didn't say that. I didn't say he doesn't really get that angry.
>
> * * *
>
> [Defense Counsel]: I have written here, please correct me, your dad screams, but not in an angry way, did you say that on direct?
>
> [G.P.:] That was to get my attention when I came back in the house.
>
> [Defense Counsel]: All right. And so, you said then later during your direct examination that your dad laughs a lot?
>
> [G.P.:] When he's nervous.
>
> [Defense Counsel]: When he's nervous?
>
> [G.P.:] Yes.
>
> [Defense Counsel]: But not when he's angry at you?
>
> [G.P.:] No.
>
> [Defense Counsel]: When he's angry at you, he scares you?
>
> [G.P.:] He doesn't scare me.
>
> [Defense Counsel]: He doesn't scare you?
>
> [G.P.:] No.

*Id.* at 145-46. Defense counsel asked for a sidebar, where she argued that
G.P.'s testimony opened the door to allow her to ask about physical discipline
to impeach G.P. The following exchange took place:

> THE COURT: I don't believe that the door has been opened with
> regard to [physical] discipline at this point.
>
> [Defense Counsel]: She testified on direct that—she just agreed
> to it after I rephrased my question, that her dad didn't really
> scream at her when she got home and that he wasn't angry.
>
> [Commonwealth]: Correct, that's not the same question.
>
> THE COURT: Yeah.
>
> [Commonwealth]: She did just say that—she also said that—she
> didn't say that he doesn't yell. She did say that he yelled at her
> when she got home in October, but not in an angry way. That
> time was to get her attention. But we haven't gotten into the
> whole entire relationship that she has with her parents, so she
> didn't testify to any history. The only thing that she said now is
> he doesn't scare her, but she never said before that he scares her,
> just that he physically disciplines.
>
> THE COURT: I don't think at this point there's a door open, but if
> you believe after additional testimony that the door might have
> been opened, we can address it at sidebar.

*Id.* at 146-48. Following this exchange, defense counsel did not further
question G.P. or elicit additional testimony about discipline or punishments by
her parents.

Additionally, during cross-examination at trial, G.P. was asked about the
photograph she sent Taylor in the following exchange:

> [Defense Counsel]: Now, you talked on direct examination about
> some photographs. You sent photographs to [Taylor] on
> Snapchat, right?
>
> [G.P.:] Yeah.

[Defense Counsel]: You would send photographs of your full body?

[G.P.:] Yeah.

[Defense Counsel]: Right? Sometimes in a sports bra?

[G.P.:] Yeah.

[Defense Counsel]: And a pair of red shorts?

[G.P.:] I don't remember.

[Defense Counsel]: You don't remember the red shorts? You remember the tight pants?

[G.P.:] I don't remember exactly what I wore.

[Defense Counsel]: But you do remember that these were suggestive photographs, right?

[G.P.:] Right.

[Defense Counsel]: Often times, selfies with your cellphone, right?

[G.P.:] Right.

[Defense Counsel]: The one that you said that you didn't have?

[G.P.:] I did have my cellphone, but it was just restricted.

[Defense Counsel]: And so, when you had those 15-minute periods of restricted time with your cellphone, you would take selfies, right?

[G.P.:] Right.

[Defense Counsel]: Showing your full body, right?

[G.P.:] Correct.

[Defense Counsel]: Covering your face sometimes?

[G.P.:] Sometimes.

[Defense Counsel]: Now, you've deleted all of photographs that you sent to [] Taylor, right?

[G.P.:] They—on Snapchat, they automatically delete. I don't delete them.

- 13 -

[Defense Counsel]: So, we don't have the actual photographs that you sent to [] Taylor, do we?

[G.P.:] I don't know if you have them or not.

[Defense Counsel]: Let's look at some that I think might be similar.

N.T. Jury Trial, 7/12/23 at 152-53. The Commonwealth objected and, at sidebar, defense counsel argued that she was trying to lay the foundation for G.P. to view the proposed photographs and anticipated that G.P. would admit that these photos do look like the Snapchat photos. *Id.* at 154. The trial court ruled that defense counsel had failed to lay a satisfactory foundation and denied admission of the photographs. *Id.* at 156-57. However, the trial court stressed that if defense counsel offered further evidence to lay a proper foundation, then the photos may be admissible. *See id.*; *see also* Trial Court Opinion, 8/20/24, at 38. Following this discussion, counsel did not revisit admitting the proposed photographs at issue.

Shortly thereafter, at sidebar, prior to asking any questions about G.P.'s third-party communications with older men, defense counsel confirmed with the trial court that the communications with other older men may be used to impeach G.P., but that she needed to lay a proper foundation to ask questions. *Id.* at 157-58. The trial court found that, at that time, there was not a proper foundation, but told defense counsel to "ask your question. [The Commonwealth is] going to object to what [it] believes is objectionable and then we can come back here." *Id.* at 159. Ultimately, counsel did not question or try to impeach G.P. with any prior statements about

communications with other older men. However, prior to cross-examining

G.P.'s mother, defense counsel asked for a sidebar and the following exchange

took place:

[Defense Counsel]: Your Honor, at this point, if I could just factually explain what happened here. The mother actually blocked two people on Facebook approximately nine days before. Let me just get the date right. Ten days before the third incident. The mother told the trooper at the hospital that she looked at [G.P.]'s Facebook page and saw that she was communicating with two individuals, the first of whom was named Jason between the ages of 45 and 50, and the second person was Shawn from Michigan who was 23 years old, and then she blocked those two accounts and informed those two individuals that they cannot communicate with this 15-year-old girl.

On direct, over my objection, counsel was permitted to ask, how did it make you feel to learn that her daughter had sex with a 40-year-old man? She said, it was [a] shock, it was beyond her imagination and it was out of the realm of character of how [G.P.] behaved.

[Commonwealth]: I don't believe she said—that is not what she said.[14] She said it was beyond her imagination.

[Defense Counsel]: The last—

THE COURT: Shock beyond their imagination.

_____

[14] On direct examination, following defense counsel's overruled objection to the question, the following exchange occurred between the Commonwealth and G.P.'s mother:

[Commonwealth]: Ma'am, how did you feel when you found out your daughter had been with a 40-year-old man?

[G.P.'s MOTHER]: That was a shock, like—that was a shock because, you know, we—that is beyond our imagination that—that, you know, such an age gap and someone would do like that. We don't think about it.

N.T. Jury Trial, 7/12/23, at 217-18.

[Commonwealth]: Specific to her daughter sneaking out to meet a 40-year-old man. Your Honor already ruled this inadmissible and at—

THE COURT: How does that open the door to this?

[Defense Counsel]: Because it rebuts and contradicts any shock that she would be with a 40-year-old man.

THE COURT: I'm not going to allow it. I don't think the door [has] been properly opened.

*Id.* at 219-20. The trial court found that the defense failed to lay a proper foundation based on the witness's answers to the questions posed, and that allowing the evidence that G.P. had been communicating with other older man was more prejudicial than probative. *See* Trial Court Opinion, 8/20/24, at 33.

Ultimately, at the close of trial, the trial court instructed the jury regarding the mistake of age defense. *See* N.T. Jury Trial, 7/14/23, at 84-85. On July 14, 2023, the jury convicted Taylor of the above-mentioned charges. On that same date, the trial court ordered a pre-sentence investigation report as well as an evaluation by the Sexual Offender Assessment Board (SOAB) to determine if he was a sexually violent predator.

Following several continuances, on February 14, 2024, the trial court sentenced Taylor to an aggregate term of 8 to 16 years of total confinement followed by three years of probation. The trial court also ordered Taylor to complete a drug and alcohol evaluation and sex offender treatment.[15] Additionally, the trial court ordered Taylor to comply with any and all special

_____

[15] SOAB determined Taylor was not a sexually violent predator. *See* Sentencing Hearing, 2/14/24, at 33.

- 16 -

conditions for sex offenders as imposed by the Pennsylvania Board of Probation and Parole and to register under the Sex Offender Registry and Notification Act (SORNA), 34 U.S.C. §§ 20901 et seq. **See** N.T. Sentencing Hearing, 2/14/24, at 32-35.

On February 22, 2024, Taylor filed a post-sentence motion, arguing, *inter alia*,[16] that the verdict was against the weight of the evidence. **See** Post-Sentence Motion, 2/22/24, at ¶¶ 47-50. On May 6, 2024, the trial court denied Taylor's post-sentence motion.

Taylor filed a timely notice of appeal. Both Taylor and the trial court complied with the requirements of Pa.R.A.P. 1925. On appeal, Taylor raises the following issues for our review:

> [1.] Did the trial court err in denying [Taylor's] request to suppress his statement made to the police in violation of **Miranda** [] and its federal and state progeny, inasmuch as [Taylor's] statement was involuntary, he was subjected to a prolonged period of detention and isolation which was coercive, he was not aware of his right to remain silent and to immediately request an attorney, and his alleged waiver of his rights was not knowing, intelligent, or voluntary[?]
>
> [2.] Did the trial court err in ruling that evidence of G.P.'s father's physical discipline, [which] tended to explain why the alleged 19[-]year[-]old college student could not freely meet with and spend time with [Taylor], and why she needed to sneak out of her home, was inadmissible on the basis that a proper foundation for the admission of the evidence had not been established, that the evidence was prejudicial in nature towards G.P., and that the

---

[16] Taylor also argued that SORNA is unconstitutional and that corruption of minors statute is unconstitutionally vague, requested to stay his sexual offender registration, and filed a motion for reconsideration of his sentence and for leave to file an amended post-sentence motion. **Id.** at ¶¶ 1-46; 51-57; 58-64; 65-66.

"door had not been opened" to allow such evidence to be presented to the jury[?]

[3.] Did the trial court err in ruling that certain photographs of G.P., [which] tended to show she appeared older than she was, were inadmissible on the basis that a proper foundation for the admission of the photographs had not been established and that the photographs were prejudicial in nature towards G.P.[?]

[4.] Did the trial court err in ruling that evidence of G.P.'s mother blocking G.P.'s Facebook communications with other adult men was inadmissible on the basis that a proper foundation for the admission of the evidence had not been established, that the evidence was prejudicial in nature towards G.P., and that the "door had not been opened" to allow such evidence to be presented to the jury[?]

[5.] Was the evidence presented to the jury at trial insufficient to convict [Taylor] on all offenses based upon the uncontroverted fact that [] G.P. told [Taylor] on numerous occasions that she was a 19[-]year[-]old college student, and there was no evidence presented by the prosecution that[,] prior to being taken into custody[, Taylor] was told, led to believe, or presented with facts that would have led a reasonable person to believe that G.P. was under the age of 16, and the prosecution did not disprove [Taylor's] mistake of age defense?

[6.] Was the jury's verdict against the weight of the evidence with respect to all charges based upon the uncontroverted fact that []G.P. told [Taylor] on numerous occasions that she was a 19[-]year[-]old college student, and there was no evidence presented by the prosecution that prior to being taken into custody appellant was told, led to believe, or presented with facts that would have led a reasonable person to believe that G.P. was under the age of 16?

Appellant's Brief, at vii-viii (rearranged for ease of review).

In his first claim, Taylor argues that the trial court erred in denying his motion to suppress because he did not knowingly, intelligently, or voluntarily waive his **Miranda** rights during his police interview. **See id.** at 38. Taylor asserts that the circumstances surrounding the interview were coercive, where

he was sleep-deprived after being held in custody and handcuffed to a pole with his arm elevated above his head for eight hours prior to the interview. *Id.* at 42, 45. Taylor argues that he did not know what was occurring during the interview, and points to Trooper McCormack's question to him of "are you comprehending" the waiver form as "clear and convincing, irrefutable evidence that . . . [Trooper McCormack did not] believe that [Taylor] knew what was occurring." *Id.* at 42-44. Further, Taylor relies upon the fact that he asked several times if he needed a lawyer during the interview and never signed the *Miranda* waiver. *Id.* at 42-43.

> When reviewing an order denying a motion to suppress:

> [O]ur standard of review . . . is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. [When] the Commonwealth prevail[s] before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous.

*Commonwealth v. Kemp*, 195 A.3d 269, 275 (Pa. Super. 2018). Additionally, when reviewing the denial of a suppression motion, this Court reviews only the suppression hearing record, and not the evidence elicited at trial. *In the Interest of L.J.*, 79 A.3d 1073, 1085 (Pa. 2013).

Before an individual in police custody may be interrogated, he must first be informed, in clear and unequivocal terms, that he has the right to remain silent, that anything he says can and will be used against him in court, that

he has the right to consult with counsel and to have counsel present during interrogation, and, if he is indigent, counsel will be appointed for him. *Miranda*, 384 U.S. at 467–69. If an individual "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease," and any statement taken after the person invokes his privilege "cannot be other than the product of compulsion, subtle or otherwise." *Id.* at 473-74.

Further "if the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.* at 474. However, to invoke the right to counsel under *Miranda*, a suspect must do so unambiguously. *Davis v. United States*, 512 U.S. 452, 459 (1994). If a suspect makes a statement regarding the right to counsel that is ambiguous or equivocal, the police are not required to end the interrogation, nor are they required to ask questions designed to clarify whether the suspect is invoking his *Miranda* rights. *Id.* at 461-62.

After initially being advised of his *Miranda* rights, an accused may waive his rights as long as his waiver is voluntary and knowing. *See Commonwealth v. Smith*, 210 A.3d 1050, 1058 (Pa. Super 2019). It is the Commonwealth's burden to establish that a defendant knowingly and voluntarily waived his *Miranda* rights. *See Commonwealth v. Cohen*, 53 A.3d 882, 885–86 (Pa. Super. 2012). The determination of whether the waiver is valid depends on a two-part inquiry:

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion[,] or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived.

An examination of the totality of the circumstances includes a consideration of (1) the duration and means of an interrogation; (2) the defendant's physical and psychological state; (3) the conditions attendant to the detention; (4) the attitude of the interrogator; and (5) any and all other factors that could drain a person's ability to withstand suggestion and coercion.

*Smith*, 210 A.3d at 1058 (citations, internal quotation marks, and brackets omitted). A defendant does not need to execute a written waiver to expressly waive his rights; rather, waiver occurs when there is a sufficient manifestation of an intent to waive one's rights. *See Commonwealth v. Baez*, 21 A.3d 1280, 1286 (Pa. Super. 2011). However, "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

Additionally, "a valid waiver of *Miranda* rights requires that the suspect have an awareness of the general nature of the transaction giving rise to the investigation." *Commonwealth v. Dixon*, 379 A.2d 553, 556 (Pa. 1977). The Commonwealth must prove by a preponderance of the evidence that the defendant knew of the occasion for the interrogation. *Id.* "This burden may sometimes be satisfied by the establishment of circumstances attending the

interrogation, such as . . . the fact that interrogation follows hard upon the criminal episode and there is no circumstance lending ambiguity to the direction and purpose of the questioning." **Commonwealth v. Carr**, 580 A.2d 1362, 1365–66 (Pa. Super. 1990), citing **Dixon**, 379 A.2d at 556. It is not required that a suspect be informed of each and every crime under investigation. **Carr**, 580 A.2d at 1366.

Here, Trooper McCormack testified at the suppression hearing that Taylor did not appear to have any difficulty communicating with him and did not appear to be under the influence of any substances. **See** N.T. Suppression Hearing, 4/21/23, at 19-20. Further, Trooper McCormack described Taylor as "articulate and intelligent" and he observed no impediments regarding Taylor's ability to comprehend. **Id.** Moreover, the trial court credited Trooper McCormack's testimony regarding the circumstances of Taylor's **Miranda** waiver and found the interrogation was not combative or coercive. **Id.** at 7; **see also** Police Interview Video, 1/16/21[17] (Taylor appearing calm and alert with handcuffed hands in lap). The record is clear that Taylor was provided with **Miranda** warnings prior to his interview at the barracks, both written and orally, although he did not sign the waiver form. **See** N.T. Suppression Hearing, 4/21/23, at 3, 16-18. **See also Baez**, **supra** (defendant need not execute written waiver to expressly waive rights)

_____

[17] The video recording of Taylor's interview has low volume, which results in some sections being difficult to hear. Thus, we cite to the both the video and transcript of testimony where applicable.

Based on the totality of the circumstances, we agree with the trial court that the record reflects that Taylor made a knowing and voluntary waiver of his *Miranda* rights. *See Smith*, *supra*. After appearing to silently read the waiver form and asking questions that indicated he understood the contents of the form, Taylor stated, "I'm willing to talk to you about the incident" and told Trooper McCormack what he thought was happening prior to the trooper asking questions about the incident, showing an intent to waive his rights. *See* Police Interview Video, 1/16/21, at 4:38-5:04; 5:08-5:17 (Taylor asking "so, that's wa[i]ving my right for an attorney" and "can I just provide my side of the story and not say I don't want an attorney?"); 8:20-8:26; *Baez*, *supra*. Further, Taylor's statement that he assumed that the reason he was still in custody was because G.P. was not in college and not 19 years old indicates he understood the general purpose of the investigation. *See* Police Interview Video, 1/16/21, at 8:22-9:07; *see also Commonwealth v. Fox*, 697 A.2d 995, 999 (Pa. Super. 1997) (suspect's statement made prior to being asked any question concerning criminal behavior showed he was aware of general nature of interrogation); *Carr*, *supra*. Additionally, Taylor did not unambiguously invoke his right to an attorney until he stated, "Can I get a lawyer at this point. . . I do want a lawyer[,]" at which point Trooper McCormack ended the interview. *See* Police Interview Transcript, 1/16/21, at 11, 19-20. *See Davis*, *supra*.

Accordingly, for the foregoing reasons, we discern no error on the part of the suppression court in denying Taylor's suppression motion, and, thus, this issue is without merit.

In his next three issues, Taylor argues the trial court erred in its above-described evidentiary rulings, which we review for an abuse of discretion. *See Commonwealth v. Brown*, 212 A.3d 1076, 1086 (Pa. Super. 2019). "An abuse of discretion exists where there is an overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will[,] or partiality, as shown by the evidence of record." *Commonwealth v. Gross*, 241 A.3d 413, 418 (Pa. Super. 2020) (internal quotation marks and citation omitted).

> Where the discretion exercised by the trial court is challenged on appeal, the party bringing the challenge bears a heavy burden. . . . [I]t is not sufficient to persuade the appellate court that it might have reached a different conclusion if, in the first place, charged with the duty imposed on the court below; it is necessary to go further and show an abuse of the discretionary power[.]

*Commonwealth v. Williams*, 91 A.3d 240, 248-49 (Pa. Super. 2014) (en banc) (quotation marks, some indentations, and citations omitted).

Relevance is the threshold question for admissibility of evidence. *Commonwealth v. Cook*, 952 A.2d 594, 612 (Pa. 2008). Under Pennsylvania Rule of Evidence 402, "[a]ll relevant evidence is admissible[,]" and "[e]vidence that is not relevant is not admissible." Pa.R.E. 402. "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference

or presumption regarding a material fact." ***Commonwealth v. Semenza***, 127 A.3d 1, 7 (Pa. Super. 2015) (citation omitted). However, evidence may be excluded where its probative value is outweighed by a danger of confusing the issues, misleading the jury, or unfair prejudice. ***See Semenza***, ***supra***; ***see*** Pa.R.E. 401 (indicating "[t]he court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence").

At trial, it is axiomatic that a party must lay a foundation for evidence to be admissible. ***Commonwealth v. Ford***, 301 A.2d 856, 857 (Pa. 1973). If a party does not establish a connection between the proffered evidence and "the parties or events which are the subject of the litigation," a court may exclude the evidence. ***Commonwealth v. Pollock***, 606 A.2d 500, 506 (Pa. Super. 1992).

Evidence initially determined to be inadmissible "may later be admitted when additional foundation is laid, [or] when additional facts are adduced which establish relevancy[.]" ***Commonwealth v. Jorden***, 482 A.2d 573, 580 (Pa. Super. 1984). "A litigant opens the door to inadmissible evidence by presenting proof that creates a false impression refuted by the otherwise prohibited evidence." ***Commonwealth v. Nypaver***, 69 A.3d 708, 716 (Pa. Super. 2013).

In his first evidentiary claim, Taylor raises two sub-issues, which we address together. In his first sub-issue, Taylor argues that the trial court

abused its discretion in determining at the pre-trial proceedings that evidence of G.P.'s father's prior physical discipline was inadmissible because Taylor failed to establish that he knew of the physical discipline. *See* Appellant's Brief at 28-32. Specifically, Taylor contends that trial counsel proffered evidence from Taylor's police interview that showed that Taylor had been told by G.P. that her father hit her. *Id.* at 29. In his second sub-issue, Taylor contends that the trial court erred, at trial, in determining that the evidence was prejudicial and that the "door had not been opened" to allow such evidence for use of impeachment. *Id.* at 29-32. Taylor contends that the father's physical discipline was relevant and should have been permitted to be used as prior inconsistent statements to impeach G.P.'s testimony at trial on direct examination about her father "jok[ing] and laugh[ing] in stressful situations" and that he did not scare her. *Id.* at 29-31. Taylor posits that the evidence of the father's physical discipline of G.P. was "critical to Taylor's reasonable belief that G.P. was a 19-year old Indian living at home with first generation, strict, traditional Indian parents during the COVID pandemic," and that, without the evidence of physical discipline, Taylor could not present his mistake of age defense against the Commonwealth's "false" narrative of G.P.'s household. *Id.* at 32. We disagree.

Pennsylvania Rule of Evidence 613 governs the impeachment of a witness' credibility by a prior inconsistent statement. *See* Pa.R.E. 613(a). A prior statement is admissible for impeachment so long as it is inconsistent with trial testimony. *See Commonwealth v. Brown*, 648 A.2d 1177, 1185

(Pa. 1994). "[M]ere dissimilarities or omissions in prior statements do not suffice as impeachable evidence; the dissimilarities or omissions must be substantial enough to cast doubt on a witness' testimony to be admissible as prior inconsistent statements." *Commonwealth v. Johnson*, 758 A.2d 166, 170 (Pa. Super. 2000), quoting *Commonwealth v. Cruz-Centeno*, 668 A.2d 536, 544 (Pa. Super. 1995).

Regarding Taylor's first sub-issue, we find no abuse of discretion by the trial court in its pre-trial evidentiary determination. At the pre-trial hearings, Taylor offered his statement from his police interview that "[G.P.'s parents] yell and scream and hit her" to prove he knew of physical discipline, but failed to establish whether those actions occurred during the period of contact between Taylor and G.P. *See* N.T. Pre-Trial Motions Hearing, 4/27/23, at 7-8; *see also* Order, 4/28/23, at ¶ 5 (in camera hearing to determine whether discipline occurred during the period of contact between Taylor and G.P. **and** whether G.P. communicated this discipline to Taylor). While Taylor presented evidence at the in camera hearing that G.P. stated, in her forensic interview, her father attempted to hit her on two different instances, counsel did not offer any evidence that these specific instances were conveyed to Taylor nor did counsel subpoena G.P. to testify as to whether she told Taylor that her father physically disciplined her during their relationship. *See* N.T. In Camera Hearing, 6/5/23, at 14-17.

Regarding his second sub-issue, G.P.'s testimony at trial did not open the door to admitting evidence of physical discipline by G.P.'s father.

Specifically, G.P. testified on direct examination that her father laughs when he is nervous and screamed to get her attention after she snuck out and later, on cross-examination, that her father does not scare her.  **See** N.T. Jury Trial, 7/12/23 at 97, 116, 145-46.  However, in her forensic interview, G.P. did not state she was afraid of her father.  Accordingly, Taylor failed to demonstrate that G.P.'s testimony was actually inconsistent with her prior statements about physical discipline from her forensic interview to warrant admission of those statements to impeach her at trial.  **See Johnson**, **supra**.

Moreover, following the court's decision during G.P.'s cross-examination, that the door was not open to admit evidence of physical discipline, the trial court stated that "if [defense counsel] believe[s] after additional testimony that the door might have been opened, we can address it at sidebar."  N.T. Jury Trial, 7/12/23, at 148.  However, counsel **did not question G.P. further** on any punishment by her parents and, therefore, did not elicit any testimony that would open the door to evidence of her father's physical discipline.  Thus, Taylor's claim that the court's ruling prevented him from putting forth a complete defense is meritless.  **See Commonwealth v. Tate**, 2025 Pa. Super. Unpub. LEXIS 1563, *15-16 (Pa. Super. filed Jun. 17, 2025)[18] (defense not limited when trial court did not prevent defense from introducing evidence through alternative method, but defense chose not to).

_____

[18] **See** Pa.R.A.P. 126(a)-(b) (unpublished, non-precedential opinions of this Court, filed after May 1, 2019, may be cited for persuasive value).

We find no abuse of discretion by the trial court and, accordingly, Taylor's claim fails.

In his second evidentiary challenge, Taylor argues that the trial court erred in ruling that the proffered photographs of G.P., which he contends were substantially similar to the Snapchat photos, were inadmissible on the basis that a proper foundation for admission had not been established. *See* Appellant's Brief, at 23. Taylor argues that this basis for preclusion was inaccurate because there was no dispute that the proposed photographs were meant to bolster Taylor's mistake of age defense and that the proposed photos were taken by G.P. at the time of their relationship. *Id.* at 25. Taylor argues that the proposed photographs were extremely relevant to his mistake of age defense and were not revealing, embarrassing, or prejudicial. *Id.* at 24-25. We disagree.

The purpose of demonstrative evidence is to "render[] other evidence more comprehensible to the trier of fact." *Commonwealth v. Serge*, 896 A.2d 1170, 1177 (Pa. 2006). As with any other evidence, demonstrative evidence must be properly authenticated, it must be relevant, and its probative value must outweigh its prejudicial effect. *Id.* Evidence is properly authenticated when its proponent produces evidence sufficient to support a finding that the item in question is what the proponent claims it is. *See* Pa.R.E. 901(a). "Demonstrative evidence such as photographs, motion pictures, diagrams, and models have long been permitted to be entered into evidence provided that the demonstrative evidence fairly and accurately

represents that which it purports to depict." **Serge**, 896 A.2d at 1177. Photos will only be admitted if a proper foundation is laid. **Commonwealth v. Sinwell**, 457 A.2d 957 (Pa. 1983).

We find no abuse of discretion in the trial court's ruling. The crux of Taylor's argument for admission is that the proposed photos were substantially similar to the Snapchat photos. Yet, in both pre-trial hearings, Taylor failed to establish that the proposed photos depicted images similar to the Snapchat photos. **See** N.T. Pre-Trial Motions Hearing, 4/27/23, at 38 (defense counsel specifically requesting in camera hearing to question G.P. about whether proposed photos were similar to Snapchat photos); **see also** N.T. In Camera Hearing, 6/5/23, at 38-42 (defense counsel failing to subpoena G.P. and did not offer evidence regarding how proposed photos were depictive of Snapchat photos). **See Serge**, **supra** (photos must fairly and accurately represent that which it purports to depict). Thus, Taylor failed to show how the proposed photographs were relevant to his reasonable belief that G.P. was 19 when he had never seen the proposed photos prior to his arrest and failed to prove that they depicted images similar to those Taylor relied on. **See id.** (demonstrative evidence must be authenticated, relevant, and more probative than prejudicial).

Furthermore, we emphasize that, at trial, after questioning G.P. about the photos she sent Taylor during their period of contact, defense counsel again failed to establish a proper foundation that the proposed photos were similar to the Snapchat photos. **See** N.T. Jury Trial, 7/12/23 at 152-53. **See**

*Pollock*, *supra*. Following the Commonwealth's objection, the trial court gave counsel an opportunity to lay a proper foundation, and counsel chose to move on from the inquiry. *Id.* at 157 (trial court stating, "I needed to see if there was some sort of foundation laid that would make them relevant. At this point, they are still not relevant based on the testimony that she gave."). *See also Tate*, *supra*. Thus, we agree with the trial court that, while not pornographic in nature, the proposed photographs depicted a fifteen-year-old provocatively, and, without a proper foundation and without evidence that the proposed photographs were substantially similar to the Snapchat photos, presenting them to the jury would have been irrelevant and overly prejudicial. *See* Trial Court Opinion, 8/20/24, at 38. Accordingly, the trial court did not abuse its discretion in finding the proposed photographs inadmissible and, thus, Taylor's claim is without merit.[19] *See Williams*, *supra*.

In his third evidentiary issue, Taylor contends that the trial court erred in ruling that G.P.'s communications with third parties were inadmissible at trial for lack of proper foundation and that the "door had not been opened" to allow the evidence to be presented to jury. *See* Appellant's Brief, at 33-37.

_____

[19] Moreover, the trial court's decision to preclude the proposed photographs did not prevent Taylor from presenting evidence that he relied on "adult" photos G.P. sent him to bolster his mistake of age defense. The record reveals that the jury heard G.P. testify that she sent Taylor provocative photos. *See* N.T. Jury Trial, 7/12/23 at 73 (G.P. testifying on direct examination that she and Taylor exchanged "vulgar pictures" on Snapchat); *id.* at 74 ("Q: So, when you sent him pictures of your body, were you sending pictures of your body with all of your clothes on or other kinds of pictures? A: Other kinds. . . More than once."); *id.* at 153 (G.P. testifying that she sent photos showing her full body, sometimes covering her face).

Specifically, Taylor argues that, under ***Commonwealth v. Black***, 487 A.2d 396, 401 (Pa. Super. 1985), this evidence was relevant to attack both G.P.'s and her mother's credibility; was not overly prejudicial; and he did not have an alternative way to challenge the credibility of G.P. and her mother. ***See*** Appellant's Brief, at 34-35. He also argues that the evidence was extremely relevant to his defense that G.P. had to take extreme actions to get away from her overly strict parents, thus, making Taylor's mistake of age belief reasonable, and the evidence contradicted the Commonwealth's evidence that suggested G.P.'s household was a "loving and jovial environment." Appellant's Brief, at 36.

The Rape Shield Law prohibits the introduction of evidence relating to a victim's sexual history, including conduct and reputation, and states:

> **(a) General rule.**--Evidence of specific instances of the alleged victim's past sexual conduct, past sexual victimization, allegations of past sexual victimization, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions of any offense listed in subsection (c) except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

18 Pa.C.S.A. § 3104(a). Our caselaw has provided additional exceptions to the Rape Shield Law, including admitting evidence of prior sexual conduct that is relevant to show bias against the defendant or to attack the credibility of the victim. ***See Black***, 487 A.2d at 401. Pursuant to ***Black***, the trial court

must determine at an in camera hearing whether: (1) proposed evidence is relevant to show a bias or motive or to attack credibility; (2) probative value of the evidence outweighs its prejudicial effect; and (3) alternative means exist to proffer bias or motive or to challenge credibility. *Id.*

Instantly, after hearing arguments and reviewing the submitted evidence at the in camera hearing, the trial court ruled on the admissibility of this evidence for impeachment. The trial court determined that defense counsel was permitted to question G.P. on any inconsistent statements she may have made regarding communications with the two older males, her claim that she only talked to her friends on Facebook, and that Taylor was the only "older guy" she had interacted with online, but allowed the Commonwealth to object if a proper foundation had not been laid. *See* Order, 6/7/23, at ¶ 2. The trial court's order was consistent with *Black* and did not preclude defense counsel from questioning and potentially impeaching G.P. with prior inconsistent statements. *See Black*, *supra*; *see also Commonwealth v. K.S.F.*, 102 A.3d 480, 483 (Pa. Super. 2014).

At trial, Taylor again failed to lay a proper foundation. In fact, after counsel confirmed with the trial court that she needed a proper foundation to question G.P. on her communications with other adult men, counsel did not ask **any** questions that may have established a foundation and, instead, changed the line of questioning. *See* N.T. Jury Trial, 7/13/23, at 159 (following sidebar about third-party communications, defense counsel asks G.P. about emails between Taylor and G.P.); *see Pollock*, *supra*. Therefore,

- 33 -

we discern no abuse of discretion where the trial court's ruling was consistent with **Black** and the trial court permitted counsel to lay a foundation, but counsel chose not to pursue evidence of the third-party communications. **See id.**; **see also Ford**, **supra**.; **Tate**, **supra**.

Furthermore, G.P.'s mother's testimony that it was a shock to discover her daughter "had been with a 40-year-old man" did not open the door to allow evidence of G.P.'s Facebook communications with other older men. N.T. Jury Trial, 7/12/23, at 217-18. G.P. did not have a physical relationship with the other two adult men. **See** N.T. Pre-Trial Motions Hearing, 4/27/23, at 22 (reading G.P.'s forensic interview stating that Taylor only adult with whom she's engaged in sexual acts); **id.** at 23 (trial court and defense counsel agreeing that communicating with other adults online is different than relationship). G.P.'s mother's testimony involved shock at G.P. and a 40-year-old man sneaking out together, not at G.P.'s communication with other adult men. **See Nypaver**, **supra**. Therefore, we find no abuse of discretion by the trial court and Taylor's claim fails. **See Gross**, **supra**.

In his next claim, Taylor argues the Commonwealth failed to present sufficient evidence to support his convictions where the Commonwealth failed to disprove his mistake of age defense. **See** Appellant's Brief, at 18-23. He maintains that the Commonwealth presented no evidence that, prior to being taken into custody, Taylor was told, led to believe, or presented with facts that would have led a reasonable person to believe that G.P. was under the age of 16. **Id.** at 21. To support his mistake of age defense, Taylor cited to

evidence that he and G.P. had met on a restricted adult section of Omegle and that G.P. repeatedly told him that she was 19 years old and taking college classes online due to the pandemic and that she could drive. **See** Appellant's Brief, at 7, 15-17. Additionally, Taylor highlighted that he asked G.P. to meet her parents, which she declined, and that, while being arrested on January 21, 2021, he expressed confusion and told the trooper he was on a date. **Id.** at 2-3, 22. G.P. also told Taylor that she "was the daughter of strict immigrant Indian parents" to explain why she wasn't allowed to drive or go out during the day or visit him on weekends, and that the only way she could leave the house was by sneaking out. **Id.** at 16-17. Further, G.P. sent Taylor photographs "depicting herself as an adult." **Id.** at 16, 22. Taylor acknowledges that, absent his defense, "in reviewing the evidence in a light most favorable to the Commonwealth as the verdict winner, it is clear that the elements of each offense were established." **Id.** at 23. Taylor is entitled to no relief on this claim.

This Court's standard of review of a challenge to the sufficiency of the evidence is well-settled:

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the [Commonwealth as the] verdict winner, are sufficient to support all elements of the offense. Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact[-]finder. The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt.

*Commonwealth v. Koch*, 39 A.3d 996, 1001 (Pa. Super. 2011) (internal citations omitted). Any question of doubt is to be resolved by the fact-finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances. *See Commonwealth v. Franklin*, 69 A.3d 719, 722 (Pa. Super. 2013). Moreover, the jury as the fact-finder determines the weight to be given to the testimony and to believe all, part, or none of the evidence. *Commonwealth v. Rabold*, 920 A.2d 857, 859 (Pa. Super. 2007) (citations omitted).

In relevant part, a person commits statutory sexual assault "when that person engages in sexual intercourse with a complainant under the age of 16 years and that person is 11 or more years older than the complainant and the complainant and the person are not married to each other." 18 Pa.C.S.A. § 3122.1(b).

A person commits aggravated indecent assault of a child if he engages in:

> penetration, however slight, of the genitals or anus of a complainant with a part of the person's body for any purpose other than good faith medical, hygienic[,] or law enforcement procedures . . . if [the] complainant is less than 16 years of age and the person is four or more years older than the complainant and the complainant and the person are not married to each other.

*Id.* § 3125(a)(8).

A person commits IDSI "when the person engages in deviate sexual intercourse with a complainant. . . who is less than 16 years of age and the

person is four or more years older than the complainant and the complainant and person are not married to each other." *Id.* § 3123(a)(7).

A person who is 18 years old or older commits corruption of a minor if he "by any course of conduct in violation of Chapter 31 (relating to sexual offenses) corrupts or tends to corrupt the morals of any minor less than 18 years of age, or who aids, abets, entices[,] or encourages any such minor in the commission of an offense under Chapter 31[.]" 18 Pa.C.S.A. § 6301(a)(1)(ii). However, "[w]henever in this section the criminality of conduct depends upon the corruption of a minor whose actual age is under 16 years, it is **no defense that the actor did not know the age of the minor or reasonably believed the minor to be older than 18 years**." *Id.* at § 6301(d)(1) (emphasis added).

A person commits unlawful contact with a minor:

if the person is intentionally in contact with a minor . . . for the purpose of engaging in an activity prohibited under any of the following provisions under this title, and either the person initiating the contact or the person being contacted is within this Commonwealth: . . .

(1.2) Any of the offenses enumerated in Chapter 31 (relating to sexual offenses).

(c) Definitions. . . .

"Minor." An individual under 18 years of age.

18 Pa.C.S.A. §§ 6318(a)(1.2); (c).

An element of three of Taylor's challenged convictions is the requirement that the complainant be under 16 years old. *See* 18 Pa.C.S.A. §§ 3122.1(b), 3125(a)(8), 3123(a)(7).

It is well-established that,

[i]n any criminal prosecution, the Commonwealth has the unshifting burden to prove beyond a reasonable doubt all elements of the crime charged. The burden is neither increased nor diminished when a defendant attempts to disprove an element of the crime by introducing an affirmative defense[, such as the mistake of age defense]. Accordingly, when charging a jury, a trial [court] must communicate to the jury that when evidence of an affirmative defense is offered, the Commonwealth still has the burden to prove each element of the crime charged beyond a reasonable doubt. Thus, the burden never shifts to the defendant. Moreover, the trial [court] must state that the jury's determination that the affirmative defense has not been established is essential to finding that the Commonwealth has met its burden.

*Commonwealth v. Cottam*, 616 A.2d 988, 1000-01 (Pa. Super. 1992) (citations omitted); *see also Commonwealth v. Scott*, 73 A.3d 599, 603 (Pa. Super. 2013).

The mistake of age defense is governed by 18 Pa.C.S.A. § 3102, which provides that, "[w]hen criminality depends on the child's being below a critical age older than 14 years, it is a defense for the defendant to prove by a preponderance of the evidence that he or she reasonably believed the child to be above the critical age." 18 Pa.C.S.A. § 3102. Section 3102 places the initial burden on the accused to present a mistake of age defense. *See Commonwealth v. A.W.C.*, 951 A.2d 1174, 1178 (Pa. Super. 2008) (citation omitted). Once the defendant proffers the defense, the burden shifts to the Commonwealth to disprove the defense. *See id.* at 1178-79 (absent

defendant proffering such defense, Commonwealth bears no burden of proof regarding defendant's knowledge of or belief as to age of child victim).

The record reflects that Taylor drove to Pennsylvania from Virgina on three occasions to have sex with G.P. in the back of his car. *See* N.T. Jury Trial, 7/12/23, at 80, 92; *see also* Commonwealth's Exhibits C-46, C-47, and C- 48 (forensic evidence from third encounter of Taylor's sperm being found in G.P.'s mouth and Taylor's sperm in used condom that also had G.P.'s DNA). The record is also clear that G.P. was 15 years old during all three encounters. Thus, the evidence is sufficient to support each of Taylor's convictions and the only question before us, as Taylor argues, is whether the Commonwealth failed to disprove his mistake of age defense beyond a reasonable doubt.

At the outset, we note that the mistake of age defense is entirely unavailable to Taylor for his conviction of corruption of minor. *See* 18 Pa.C.S.A. § 6301(d)(1). *See Commonwealth v. Vazquez*, 296 A.3d 603, n.35 (Pa. Super. filed March 13, 2023) (Table) (mistake of age defense inapplicable to charge of corruption of minor when minor's actual age is under 16 years old).

Regarding Taylor's mistake of age defense for his remaining convictions, G.P. testified at trial, that, prior to meeting in-person, she told Taylor that she was not allowed to take the car out or leave the house at night, and would not have access to her phone at night because it had to be plugged in in her parents' room. *See* N.T. Jury Trial, 7/12/23, at 78-79. Additionally, G.P. testified that, after she was caught sneaking back into her house after meeting

with Taylor for the second time, she told Taylor that she got caught and had consequences and did not go "into detail with all of them." *Id.* at 101. However, G.P. stated she told Taylor that her mom was sleeping on the floor of G.P.'s bedroom to keep an eye on her and that she could not communicate with him as much due to her phone and laptop use being restricted. *Id.* at 167. G.P. also testified she asked Taylor if he was really 27 years old because he did not look 27 and he had a BMW SUV, which 27-year-olds typically do not have. *Id.* at 96. Taylor then told her he was 32 years old. *Id.*

The Commonwealth then presented Taylor's police interview, which included his statements that he and G.P. did not have sex and that they may have sex in the future when she was a little older, more mature, and could leave the house. *See* Commonwealth's Exhibit C-54. Further, in the police interview, Taylor admitted that he knew G.P. had her phone taken away and that she had been punished for sneaking out of the house and having sex with someone else in the past. *Id.* Additionally, when discussing that the only way G.P. could leave was by sneaking out, Taylor stated that he "thought that was crazy for a college kid. I was like, how in the world do your parents have such an iron fist grip on you?" *Id.*

The jury also heard testimony from G.P.'s neighbors, Murtaugh and Reeves, who saw Taylor and G.P. on January 16, 2021 after Taylor helped G.P. sneak out of the house using a ladder. Murtaugh stated that the situation gave him "a weird feeling, I guess, since like I said, she [was] a minor and he looked like an adult, and it was fairly late at night. He had a ladder as well,

so it just looked like a weird situation." N.T. Jury Trial, 7/12/23, at 37. Murtaugh described Taylor as looking uncomfortable. *Id.* at 38. Reeves described Taylor as "clearly very much older than [G.P.] and [Reeves] had never seen him before anywhere around." *Id.* at 51.

Email exchanges between Taylor and G.P. were also introduced into evidence that included discussions of G.P. skipping school and Taylor suggesting he could meet her "at the local high[]school near [her]" and that Skype was blocked on her school laptop. *See* Commonwealth's Exhibit C-35. Further, in an email dated December 3, 2022, when Taylor asked G.P. if she could sneak out again, she told him she could, but it would be more risky, and if she were caught, she would not get her phone back, would be doing cyber school "for good," and her instruments and room would be taken away. *Id.* The email exchanges also included Taylor and G.P. planning to buy a ladder and sneak her out of her room via her roof. *See* Commonwealth's Exhibit C-34.

It is clear that, considering the totality of the evidence, the Commonwealth disproved Taylor's mistake of age defense. *See A.W.C.*, *supra*. Indeed, there was ample evidence that Taylor was aware that G.P. was living with her parents, had various restrictions on her ability to leave the house and her technology usage, and was punished by her parents sleeping in her room and having her phone taken away. *See Vazquez*, 296 A.3d 603, 603 (evidence of victim living with parents and her phone taken away by mother contributed to Commonwealth evidence to disprove defendant's

reasonable belief of victim's age in mistake of age defense). Further, G.P.'s testimony showed that she did not believe Taylor's age. As the trial court noted, "even this minor child reasonably suspected that [Taylor] was lying about his age. A forty-year-old adult should have reasonably suspected that [G.P.] was not being truthful about her age with all the suspicious clues set forth before him." *See* Trial Court Opinion, 8/20/24, at 47.

The emails also contributed to disproving the reasonableness of Taylor's belief that G.P. was 19 years old and in college, such as discussions about the various restrictions on her school laptop and having to do "cyber school" for good if she was caught sneaking out. Further, even with extremely strict parents, it is far-fetched for a reasonable person to believe that, in order to meet with a 19-year-old college student, he would need to resort to buying an eight-foot ladder to sneak her out of her bedroom from the roof of her parents' house. Moreover, Taylor was explicitly described as looking "uncomfortable" after he helped sneak G.P. out of her house. There was also evidence that Taylor made statements in his police interview suggesting he doubted G.P.'s age prior to his arrest. *See Koch*, *supra*. As stated by the trial court, "there were numerous red flags raised that a reasonable person would have questioned [G.P.'s] claim that she was 19 years old. [Taylor's] choice to ignore all of the above facts. . . was absolutely not reasonable in these circumstances." Trial Court Opinion, 8/20/24, at 48. The record demonstrates that the jury was properly instructed on the mistake of age defense and, nevertheless, found Taylor guilty of the crimes charged. *See*

N.T. Jury Trial, 7/14/23, at 84-85. As such, we are bound by the jury's credibility determination. **See Rabold**, **supra**. Therefore, Taylor's claim is without merit.

In his final issue on appeal, Taylor contends that the jury's verdict was against the weight of the evidence. **See** Appellant's Brief, at 14-18. Taylor argues that the Commonwealth failed to present evidence that disproved his mistake of age defense, and that the evidence presented "unquestionably" demonstrated that he was clearly misled by G.P. into believing she was 19 years old. **Id.** at 15-17. Taylor is entitled to no relief.

Where the trial court has ruled on a weight claim, "an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim." **Commonwealth v. Cruz**, 919 A.2d 279, 282 (Pa. Super. 2007) (internal citations omitted). "[T]he essence of appellate review [of] a weight claim appears to lie in ensuring that the trial court's decision has record support. Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion." **Commonwealth v. Clay**, 64 A.3d 1049, 1054-55 (Pa. 2013) (citations and quotation omitted). The reviewing court may only reverse the trial court if the verdict is so contrary to the evidence as to "shock one's sense of justice." **Commonwealth v. Champney**, 832 A.2d 403, 408 (Pa. 2003) (internal citations omitted).

Taylor's weight argument relies on the same facts as his sufficiency claim. **See** Appellant's Brief, at 14-18, 21. After reviewing the record, the trial court found:

> the evidence strongly supports the verdict on each of the counts. The testimony from the many witnesses was compelling, was corroborated by the testimony of other witnesses, and was corroborated by the admitted exhibits. The jury's verdict on these charges is not so contrary to the evidence as to shock one's sense of justice or conscience.

Trial Court Opinion, 8/20/24, at 51.

On this record, we discern no abuse of discretion in the trial court's rejection of Taylor's weight claim. **See Cruz**, **supra**. The trial court observed the proceedings, and its conscience was not shocked by the jury's verdict. **See Champney**, **supra**. Therefore, Taylor's weight claim fails.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/1/2025